**SO ORDERED.**

**SIGNED this 29th day of October, 2015.**



_____
Robert E. Nugent
United States Chief Bankruptcy Judge

PUBLISHED

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANASAS

| IN RE: | |
|---|---|
| RYAN D. MILLS | Case No. 14-12601 |
| | Chapter 13 |
| **Debtor.** | |

## MEMORANDUM OPINION

The parties to this matter all agree that valid grounds exist to dismiss or convert this chapter 13 case for cause under § 1307(c). They differ on whether the Court can convert a chapter 13 case to chapter 7 after the debtor has requested dismissal under § 1307(b) and, second, whether it would better serve the interests of the creditors to dismiss this case or convert it to chapter 7. If, as a matter of law, the debtor's motion to dismiss must be granted, whether the case should be converted is a moot point.

1

11 U.S.C. § 1307(b) says that the court "shall" grant the request of the debtor to dismiss his case "at any time." But subsection (c) provides that the court "may" dismiss a chapter 13 case for cause or convert it to chapter 7 if that would be in the best interests of the creditors and estate. Mills says that the statute's mandate to dismiss the case trumps the discretionary power to convert his case. Creditors Jason Appell, Kevin Law, and Robert Law, joined by Kanza Bank (and the trustee, at least in the beginning) assert that "Debtor's absolute right to dismiss is qualified by an implied exception for bad faith conduct and/or abuse of the bankruptcy process."[1] Given the explicit mandatory language of § 1307(b), the limits the Supreme Court has placed on the scope of § 105(a), and the voluntary nature of chapter 13 relief, I find no "implicit exception" to the debtor's unqualified right of dismissal. The motion to convert is moot and Ryan Mills' case must be dismissed.[2]

**<u>Procedural History</u>**

Mills filed his chapter 13 case on November 20, 2014. He submitted a 36-month plan that proposed monthly payments of $1,500. After the debtor's first meeting of creditors on December 19, the trustee filed her initial objections to the plan on December 22. Appell and the Laws filed theirs on January 27, 2015 along with a motion to extend their time in which to file a dischargeability complaint. In February, the Internal Revenue Service amended its proof of claim, increasing it from $11,615

---

[1] Dkt. 65.
[2] The debtor Ryan Mills appeared in person and by his attorney Mark J. Lazzo. The chapter 13 trustee Laurie B. Williams appeared by her attorney Karin Amyx. The Law creditors appeared by their attorney Tom Gilman. Chris Borniger briefly appeared for creditor Kanza Bank but requested to be excused from participation in the proceedings and the Court granted that request.

2

to $79,883. In March, the trustee filed her supplemental objection that questioned Mills' eligibility due to exceeding the debt limit. At trial, both the debtor's and the trustee's counsel stated that the debtor had agreed to dismiss his case after the supplemental objection was filed.[3] But no such order was entered and then, on April 23, the trustee moved to convert the case to chapter 7. On May 5 the debtor objected to that motion and, on May 14, the debtor moved to dismiss. Appell and the Laws objected to debtor's motion and, in their response, joined in the trustee's motion to convert. All of these matters were called for trial on August 18, after Appell and the Laws conducted only document discovery. At trial, the trustee stood mute on the motion to convert, leaving Appell and the Laws to prosecute it. Because Mills has asked to voluntarily dismiss his case, objections to the confirmation of his chapter 13 plan are moot, leaving only his motion to dismiss and Appell's and the Laws' motion to convert before me today.

**Facts**

The underlying question here is one of law: can the court deny a debtor's motion to dismiss his chapter 13 case for bad faith conduct and/or an abuse of the bankruptcy process? But because bad faith or abuse of the process is largely a factual matter, some background is necessary.

Ryan Mills was in the construction and real estate development business before he filed his case. In 2011 he formed a company called RDM Properties LLC, d/b/a Mills Construction. In 2012, he organized M&L Development Group LLC with

---

[3] Debtor's Ex. C.

Mickey Lynch.[4] Mills also did construction work individually.[5] M&L Development's activities between 2012 and 2014 coincided with the development of Walker's Bar/Jetty's Pizza on Commerce Street in Wichita. Mills remains in the construction business.

The Walker's Bar/Jetty's Pizza project is the centerpiece of the parties' dispute. Ryan Mills acquired a 50% interest in The Tree Guys LLC in 2010. That entity purchased two old buildings located at 220 and 222 S. Commerce Street (the "Commerce Property") from Michael McGill. In the fall of 2011, Mills and McGill formed Commerce Street Developers, LLC (CSD) to acquire the Commerce Property from The Tree Guys.[6] CSD planned to develop the Commerce Property into Walker's/Jetty's by renovating the old buildings. Sometime later in 2012 or 2013, Robert "Rusty" Law, who owns Pacific Coast Pizza in northeast Wichita, introduced Mills to Mickey Lynch and Lynch joined the venture acquiring a 51% membership interest in CSD. The bar and restaurant opened in late December of 2013.

Along with his work for CSD, Mills did business as "Commerce Street Operators," a sole proprietorship. In 2012, he solicited a $120,000 loan from Appell and the Law brothers for development of the Commerce Property. He gave them a promissory note dated April 26, 2012 by which he agreed to repay the loan in 75 days by paying the three $40,000 each. In October of 2012, Mills borrowed another

---

[4] Ex. 27, 29. Mills organized a third entity post-petition named RDM Development, LLC. *See* Ex. 32. According to Mills, this new entity was his construction business post-petition.
[5] This is clear from some of the proofs of claim filed in the case.
[6] Ex. 24 shows that CSD was organized in 2011 with McGill and Mills as its initial members. According to McGill, he owned 51% of CSD and Mills owned 49%.

4

$140,000 from the Law brothers (but not Appell), offering to assign a 50% membership interest in CSD with Mills to keep the other 50%. He represented that the buildings were subject to valuable and transferable historical tax credits (HTCs) from both the federal government and the state of Kansas. Mills received money from the Laws, but never executed the assignments to them.[7]

Mills defaulted on the April note. He began to improvise. He offered Appell a "royalty" on Walker's operating revenue in exchange for Appell's forbearing to sue him for his portion of the April note. He convinced Appell to loan him another $60,000 in August of 2013, giving him note from Mills and CSD, the same to be payable in 30 days in the amount of $66,000.[8]

Mills met Lynch during this period of time. Lynch agreed to invest in the project and became a member of CSD in 2013, acquiring what may have been McGill's 51% interest in that company for an initial $250,000 cash investment. Mills found another investor, 222 Commerce LLC, and assigned it a 25% membership from his holdings. As of October 15, 2013 Mills owned 24%, Lynch owned 51% and 222 Commerce owned 25% interest in CSD.

Walker's and Jetty's opened in late 2013, but due to a lack of parking and other issues, did not flourish. By March of 2014, Mills had only paid Appell $20,000 of the $60,000 he had borrowed on the second note. Appell and the Law brothers sued Mills in state court in September, seeking judgment on the notes and claiming that Mills

---

[7] Nor could he have; though the record is cloudy on this point, Mills doesn't appear to have held more than 49% of CSD at that time.
[8] The extra $6,000 is euphemistically described in the instrument as "10% interest."

5

had fraudulently induced them to lend and/or invest in the enterprise. The bar and restaurant both closed by August.

In July of 2014, Mike McGill, who had previously owned this property, became interested in acquiring it again. Mills and CSD were still indebted to McGill on the purchase money mortgage notes that Tree Guys had granted to McGill when it acquired the property from him in 2010. McGill formed Uncondemned Properties, LLC ("UP") in July of 2014 to reacquire the Commerce Property from CSD. He was UP's managing member and owned 86% of it; Mills owned the other 14%.[9] UP purchased the Commerce Property for $523,900 under an asset purchase agreement executed on August 28, 2014, and assumed Mills' and CSD's indebtedness to McGill which, according to the reinstatement documents signed by Mills, amounted to about $440,000 for which Mills remained personally liable.[10] At closing, funds were to be distributed to several mechanics' lien claimants, to Sedgwick County for past-due ad valorem taxes, and to Garden Plain State Bank to release a prior mortgage. Mickey Lynch received $100,000, and 222 Commerce LLC $243,000 to retire their respective interests in CSD. Mills assigned 100% of CSD's state and federal historic tax credits to Lynch. This left Mills the sole member of CSD, but CSD no longer held any assets.

Even after transferring his 51% interest in CSD, Lynch executed a deed on September 4 as a "member" of CSD, conveying the Commerce Property to UP. At closing, Lynch received 14% of UP, Mills' interest increased to 35%, and McGill

---

[9] *See* Ex. 105, pp. 147-176 – original Operating Agreement for UP executed July 17, 2014. How or why Mills retained this interest was not explained at trial.
[10] Ex. 105, pp. 275-89, 304-06.

6

retained 51%.[11] Lynch could not say what, if any, consideration he paid for his interest in UP or how he acquired it. McGill testified that a side deal made at closing changed the members' percentages and granted Lynch his 14% interest in UP.[12] Lynch paid nothing for it.

Then, shortly after the closing on September 4, UP bought out Mills' 35% interest in it for $42,000 cash and forgave Mill's personal liability on the Tree Guys $440,000 debt. McGill conceded that there was no writing that evidenced the release of Mills.[13] We cannot tell whether this transfer occurred before or after Appell and the Law brothers filed their state court suit against Mills on September 9, 2014.

Appell and the Law brothers say that this series of transactions should be examined by a trustee and, possibly, avoided for the benefit of Mills' creditors, even though most of the transfers appear to involve the property of entities, not of Mills individually. They also say that Mills filed his bankruptcy case in bad faith and abused the legal process because he filed this case immediately after the state court pretrial discovery conference in their suit and because his bankruptcy pleadings reflect some inconsistencies. For example, Mills discloses that he sold his 35% interest in UP to McGill for $42,000, but does not refer to his being forgiven on the Tree Guys debt. He failed to append exhibits referenced in his statement of financial affairs that

---

[11] An operating agreement for UP was executed by the members of UP on September 4, 2014 showing these revised interests. *See* Ex. 110.
[12] This change was allegedly negotiated and agreed upon by the parties notwithstanding an "entireties clause" in the asset purchase agreement. *See* Ex. 105, p. 285, ¶ 11. No written document that memorialized this oral agreement or modified the asset purchase agreement was produced at trial.
[13] Mills disclosed the sale and transfer of this interest in his Statement of Financial Affairs, Questions 2 and 10.

7

would have detailed his pending lawsuits and business interests. At trial, though, Mills said he provided these exhibits to the trustee at the first meeting of creditors and no one contradicted that testimony. Mills' declaration on Schedule B that he retained ownership of 49% of the federal historical tax credits is also likely inaccurate because Mills never owned the credits as an individual. The entities did. Finally, Mills admitted at his first meeting and again at trial that he listed CSD's unsecured creditors as well as creditors of his construction entities on Schedule F, but disputed any personal liability for those debts.

After he filed, Mills collected about $4,500 of his construction accounts receivable and used those funds either in his construction business or for living expenses. In February of 2015, he organized a new limited liability company called RDM Development, LLC to conduct his construction business.[14] He admitted that his tax debt greatly exceeded the amounts he scheduled, and that he could not find a way to service those debts in a plan. He also desires to negotiate an offer and compromise with the Internal Revenue Service on his tax debt which he cannot do while in bankruptcy. Mills' tax claims now exceed $200,000, his assets amount to very little, and his unsecured creditors are unlikely to receive any distribution after all priority claims have been paid.

### Analysis

Appell and the Laws (and, initially, the trustee) argue that the existence of the potential transfer actions, combined with the various inaccuracies on Mills' schedules

---

[14] Ex. 32.

demonstrate his bad faith and justify converting the case to chapter 7.[15] But if I conclude that there is no "implicit exception" to a debtor's unconditional right to dismiss his chapter 13 case "at any time," their motion is moot and the case must be dismissed.

Bankruptcy Code § 1307(b) states that "on request of the debtor *at any time*, if the case has not been converted [from chapters 7, 11, or 12], the court *shall* dismiss a case under [chapter 13]."[16] Appell, the Laws, and the trustee argue that a bankruptcy judge may exercise § 105(a) equitable discretion to deny what appears to be mandatory relief under that subsection when creditors or other parties in interest demonstrate that the debtor has proceeded in bad faith. They claim the Supreme Court's decision in *Marrama v. Citizens Bank* as the foundation for this view.[17] In *Marrama*, the Supreme Court held that a chapter 7 debtor's right to "mandatory" conversion to chapter 13 could be restricted or conditioned when a court concludes that a debtor has proceeded in bad faith. Five justices of the Court concluded that nothing in the text of § 706 or § 1307(c) (which supplies examples of cause to involuntarily dismiss or convert of a chapter 13 case) "limits the authority of the court to take appropriate action in response to fraudulent conduct by the atypical litigant who has demonstrated that he is not entitled to the relief available to the typical debtor."[18] Instead, they said that courts have "broad authority" under § 105(a) to "prevent an abuse of process" by immediately denying a debtor's motion to convert a

---

[15] The trustee initially joined this view, but her counsel abandoned that position at trial.
[16] *See* 11 U.S.C. §1307(b), emphasis added.
[17] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007).
[18] *Id*. at 374-75.

9

chapter 7 case to chapter 13 when approving it might permit the debtor to take actions prejudicial to creditors.[19]

Along with denying that he acted improperly, Mills says that the court lacks discretion to deny a debtor's motion to dismiss a chapter 13 case by using § 105(a) as the *Marrama* court did. The Supreme Court's recent refinement of its holding in *Marrama* in *Law v. Siegel* supports his view.[20] There the Court concluded that the bankruptcy judge's "broad authority" did not allow for the surcharge of a debtor's exempt homestead even though the debtor committed fraud to conceal the homestead's value from the trustee. The Court held that nothing in § 105(a) gave a bankruptcy court power to rewrite § 522's rules concerning exemptions or to add conditions or exceptions to them. It noted that the *Marrama* majority concluded that § 706(d) expressly conditions a debtor's right to convert on his being eligible for chapter 13 relief and that a debtor's bad faith disqualifies him from relief in chapter 13 under § 1307(c).[21] Justice Scalia's majority opinion in *Law* also consigns *Marrama's* "broad authority" language to the realm of dicta—

> At most, *Marrama's* dictum suggests that in some circumstances a bankruptcy court may be authorized to dispense with futile procedural niceties in order to reach more expeditiously an end result required by the Code. *Marrama* most certainly did not endorse, even in dictum, the view that equitable considerations permit a bankruptcy court to contravene express provisions of the Code.[22]

---

[19] *Id*. at 375.
[20] ___ U.S. ___, 134 S. Ct. 1188 (2014).
[21] 134 S. Ct. at 1197.
[22] *Id.*

10

The narrow view of *Marrama*'s interpretation of § 706(a) taken by the *Law v. Siegel* Court makes sense. That section provides that the debtor "may" convert a chapter 7 case to one in chapter 13 if the debtor has not already converted the case to chapter 7 from another chapter. Section 706(d) appends a further limitation to the privilege of voluntary conversion: a chapter 7 debtor may not convert a case to a chapter for which he is not eligible. By contrast, § 1307(b) *mandates* dismissal on the debtor's request by using the words "at any time" and "shall." It only limits the debtor's ability to dismiss cases that have previously been converted to chapter 13 from chapters 7, 11, or 12. This court should not use § 105(a) to rewrite the mandatory provisions of § 1307(b).[23]

The interplay of § 1307(b) with the Rules of Bankruptcy Procedure lends support to that conclusion. Fed. R. Bankr. P. 1017(f)(2) governs a debtor's request to dismiss under § 1307(b) and provides that "…dismissal under … § 1307(b) shall be on motion filed and served as required by Rule 9013." That rule provides the means for serving a "request for an order," but doesn't provide for other parties having an opportunity to object. Rule 1017(f)(1) governs a motion to convert under § 1307(c), providing that such a motion shall be treated as a contested matter under Rule 9014 which, in turn, requires that parties be served with notice under Rule 7004, be granted an opportunity to object, and be given a hearing. Rule 1017(f)(2)

---

[23] *Law v. Siegel,* __ U.S. __, 134 S. Ct. 1188, 1194-95 (2014). *See also Scrivner v. Mashburn (In re Scrivner),* 535 F.3d 1258, 1263 (10th Cir. 2008) (Bankruptcy court's equitable powers under § 105(a) may not be used to contravene or disregard the plain language of a statute or exercised in a manner that is inconsistent with specific provisions of the Code.); *In re Alderete,* 412 F.3d 1200, 1207 (10th Cir. 2005); *In re Hedged-Investments,* 380 F.3d 1292, 1298 (10th Cir.2004); *In re Alternate Fuels, Inc.,* 189 F.3d 1139, 1146-49 (10th Cir. 2015).

11

contemplates that a debtor's §1307(b) dismissal motion should be granted out of hand.[24]

There is no binding Tenth Circuit precedent on the question of whether a debtor's § 1307(b) unconditioned right to dismiss is trumped by the court's § 1307(c) power to convert a case in the best interests of the creditors. Other circuits are split on the issue.[25] But a close reading of the statutory language and applicable rules, considered with the very different policies that animate chapters 13 and 7, convinces me that the debtor has the better argument and that his request to dismiss this case must be honored.[26]

The Second Circuit has adopted this view. In 1999, the Second Circuit Court of Appeals held that a chapter 13 debtor's voluntary request to dismiss must be granted even when a creditor seeks conversion instead.[27] The *Barbieri* court noted § 1307(b)'s use of the words "at any time" and "shall," and concluded that "shall" is mandatory and leaves no discretion to a court.[28] It also observed that the only exception to

---

[24] *See* Alan N. Resnick and Henry J. Sommer, 8 COLLIER ON BANKRUPTCY, ¶ 1307.03 at 1307-9 (16th Ed. 2015) (". . . because there is no right to contest the dismissal, the procedures of Bankruptcy Rule 9013, rather than Bankruptcy Rule 9014, are followed. No hearing is required.").
[25] *See In re Jacobsen,* 609 F.3d 647 (5th Cir. 2010) (chapter 13 debtor's right to voluntarily dismiss case is not absolute and may be denied on grounds of bad faith conduct and provide cause for conversion); *In re Rosson,* 545 F.3d 764 (9th Cir. 2008) (same); *In re Molitor,* 76 F.3d 218 (8th Cir. 1996) (same); *In re Barbieri,* 199 F.3d 616 (2nd Cir. 1999) (chapter 13 debtor has absolute right to dismiss so long as order converting case to chapter 7 has not been entered). All of these cases were decided prior to *Law v. Siegel.*
[26] The interpretation of a bankruptcy statute is a question of law. The inquiry begins with the language of the statute itself and courts must presume that Congress says in a statute what it means and means in a statute what it says. If the language of the statute is unambiguous, the plain and ordinary meaning of the statute controls and the judicial inquiry is complete. *In re McGough,* 737 F.3d 1268, 1272-73 (10th Cir. 2013); *In re Mallo,* 774 F.3d 1313, 1317, 1327 (10th Cir. 2014). *See also United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241 (1989).
[27] *Barbieri v. RAJ Acquisition Corp. (In re Barbieri),* 199 F.3d 616 (2nd Cir. 1999).
[28] *Id.* at 619.

12

voluntary dismissal is found in subsection (b) itself—if the debtor previously converted to chapter 13 from another chapter, the request need not be granted.[29] The Second Circuit also compared the use of "shall" in § 1307(b) to "may" in (c), the section that permits the court to convert or dismiss a chapter 13 case for cause. When "may" and "shall" are used in the same statute, "the normal inference is that each is used in its usual sense—the one act being permissive, the other mandatory."[30] The *Barbieri* court concluded that this reading of § 1307(b) reflected Congress's intent to create an entirely voluntary chapter of the Code. If creditors wish to force debtors into bankruptcy, they have recourse to § 303, but they must comply with many more requirements than "simply showing cause."[31] Finally, presaging the Supreme Court's subsequent statements in *Law v. Siegel,* the *Barbieri* court noted that § 105(a)'s equitable powers "are not a license for a court to disregard the clear language and meaning of the bankruptcy statutes and rules."[32] There being other available means to remedy abuse of the bankruptcy process, including an involuntary proceeding, sanctions, or making a criminal referral to the proper authorities, depriving the court of the power to convert in the face of a dismissal request by no means strips it of the tools it needs to sanction debtor misconduct as part of the dismissal.[33] Numerous

---

[29] *Id.*
[30] *Id.* at 620, internal citation omitted.
[31] *Id.*
[32] *Id.* at 620-21, citing *Official Comm. of Equity Sec. Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir. 1987).
[33] *See* 11 U.S.C. § 349(a); 11 U.S.C. § 109(g)(1) and (2); Fed. R. Bankr. P. 9011. *See e.g., Ross v. AmeriChoice Federal Credit Union,* 530 B.R. 277 (E.D. Pa. 2015) (dismissal with prejudice and debtor enjoined from filing future cases without permission from bankruptcy court); *In re Winder,* No. 10-07070-TOM13, 2011 WL 2620992 (Bankr. N.D. Ala. July 1, 2011) (voluntary dismissal conditioned under §109(g)(1) with 180-day refiling bar for failure to comply with confirmation order to provide tax return to trustee); *In re Hasan*, 287 B.R. 308 (Bankr. D. Conn. 2002) (after voluntary

13

bankruptcy courts have followed *Barbieri's* plain language approach to voluntary dismissals under § 1307(b), both before and after *Marrama*.[34]

The Fifth, Eighth, and Ninth Circuits have adopted the contrary view. Both the Fifth and Ninth Circuits have held that *Barbieri*'s conclusions were abrogated by *Marrama*. In *In re Jacobsen*, the case relied upon by the trustee, the Fifth Circuit held that when a debtor has acted in bad faith or abused the bankruptcy process, the case may be converted despite the debtor having made a §1307(b) motion for dismissal.[35] Deeming the absolute dismissal right an "escape hatch" for abusive debtors, the Fifth Circuit concluded that *Marrama*'s rejection of the "absolute right" to convert in § 706(c) applied equally to §1307(b), and commented that there was no "analytical distinction" between the two subsections. The court also reasoned that, because a debtor who has been converted to chapter 7 need not commit her post-petition earnings to any form of repayment, she runs no risk of involuntary servitude.

---

dismissal of case, bankruptcy court assessed attorney fees against debtor for offensive conduct during the case); *In re Polly,* 392 B.R. 236 (Bankr. N.D. Tex. Aug. 8, 2008) (§ 349 permits the court to dismiss the case with prejudice to refiling and the court may reserve the matter of sanctions under Rule 9011 following dismissal).

[34] *See Ross v. AmeriChoice Federal Credit Union,* 530 B.R. 277 (E.D. Pa. 2015) (debtor's right to dismissal under § 1307(b) is absolute, but court has the power to impose restrictions on debtor's re-filing); *Johnston v. Johnston,* 536 B.R. 576 (D. Vt. 2015) (following *Barbieri,* the controlling Second Circuit authority); *In re Procel,* 467 B.R. 297 (S.D.N.Y. 2012) (applying *Barbieri)*; *In re Dulaney,* 285 B.R. 10 (D. Colo. 2002) (concluding chapter 13 debtor has absolute right to dismiss under the clear language, history and purpose of § 1307(b)); *In re Thompson,* No. 10-23017, 2015 WL 394361 (Bankr. E.D. Ky. Jan. 29, 2015); *In re Darden,* 474 B.R. 1 (Bankr. D. Mass. 2012); *In re Williams,* 435 B.R. 552 (Bankr. N.D. Ill. 2010); *In re Neiman,* 257 B.R. 105 (Bankr. S.D. Fla. 2001); *In re Patton,* 209 B.R. 98 (Bankr. E.D. Tenn. 1997); *In re Greenberg,* 200 B.R. 763 (Bankr. S.D. N.Y. 1996) (noting that the language of § 1307(b) is "too clear to read other than as an absolute command," but the court can impose conditions and sanctions in the dismissal order); *In re Harper-Elder,* 184 B.R. 403 (Bankr. D. D.C 1995) (§ 1307(b) is mandatory – "shall" really means "shall."); *In re Looney,* 90 B.R. 217 (Bankr. W.D. Va. 1988); *In re Turiace,* 41 B.R. 466 (Bankr. D. Ore. 1984); *In re Gillion,* 36 B.R. 901 (E.D. Ark. 1983). *See also* Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4TH EDITION, § 330.1, Sec. Rev. June 16, 2004, www.Ch13online.com, for discussion and cases regarding absolute right to convert.

[35] 609 F.3d 647, 660 (5th Cir. 2010).

*In re Molitor* was a pre-*Marrama* case in which the Eighth Circuit employed similar reasoning to convert a repeat chapter 13 debtor's filing to chapter 7 over his protest without considering § 105(a). It emphasized that bankruptcy affords the honest but unfortunate debtor a fresh start, but does not grant wrongdoers a shield from paying their debts.[36] Because the debtor had not acted in good faith, he could not be permitted to bail out of bankruptcy rather than face its consequences. In *In re Rosson*, the Ninth Circuit applied *Marrama*'s reasoning to deny the debtor's request to dismiss in a similar situation. It stated that in the proper circumstances, the court could deny a request to dismiss on grounds of the debtor's bad faith conduct or to prevent an abuse of process under § 105(a).[37] Issued in 2010, *Jacobsen* is the last reported Circuit authority on this issue.

Other courts have recognized *Law v. Siegel*'s limitations on *Marrama* and declined to fashion equitable relief that contravenes express provisions of the Code.[38] In *In re Fisher,*[39] the bankruptcy court concluded that denying a § 1307(b) motion to dismiss for bad faith would be, in effect, rewriting its express language:

> It is the discord between a debtor's right to dismiss under Section 1307(b), allegations of bad faith, and a creditor's motion to convert that this Court now addresses, particularly in light of the impact of *Law v. Siegel,* which speaks to the Bankruptcy Court's power to fashion equitable relief in the presence of express statutory language that instructs otherwise.

* * *

---

[36] 76 F.3d 218 (8th Cir. 1996).
[37] 545 F.3d 764 (9th Cir. 2008).
[38] *Law v. Siegel,* __ U.S. __, 134 S.Ct. 1188, 1194, 1197 (2014).
[39] No. 14-61076; 2015 WL 1263354 (Bankr. W.D. Va. Mar. 19, 2015).

15

The Court's role is not to redraft the statute, even if it perceives a need to deter and remedy a debtor's bad-faith conduct in advance of a motion under 11 U.S.C. § 1307(b). *Law* is instructive in that regard. . .

Given the guidance in *Law*, the right of the debtor to request a bankruptcy court to dismiss an unconverted Chapter 13 case becomes even more compelling. If this Court were to refuse to grant the Debtor's request . . . it would exceed its authority by acting in direct contravention of the express terms of Section 1307(b). This Court declines to do so.[40]

I concur with these well-stated comments and conclude that *Barbieri* and the courts that follow it correctly interpret and apply § 1307(b). *Law v. Siegel* precludes bankruptcy courts from crafting a bad faith exception to a chapter 13 debtor's voluntary dismissal. Chapter 13 is a voluntary remedy only; in the absence of specific statutory direction, a debtor should be able to exit without risking being subjected to involuntary liquidation without the due process protections afforded involuntary debtors by § 303. If a debtor commits sanctionable wrongdoing in the course of the case, the court has many means of addressing that other than forced liquidation premised on a shaky legal foundation. Section 1307(b) grants a chapter 13 debtor the absolute right to voluntarily dismiss his case at any time.

### **Conclusion and Orders**

The Court GRANTS Ryan Mills' motion to voluntarily dismiss his chapter 13 case under § 1307(b) and DENIES as MOOT the motion of the trustee, Jason Appell,

---

[40] 2015 WL 1263354 at *2, *6. *See also Ross v. AmeriChoice Federal Credit Union,* 530 B.R. 277, 287-88 (E.D. Pa. May 5, 2015) (citing *Law v. Siegel* and distinguishing *Marrama*); *In re Williams,* 435 B.R. 552 (Bankr. N.D. Ill. 2010) (distinguishing *Marrama;* cited with approval in *In re Fisher*).

16

Kevin Law, Robert Law, and Kanza Bank to convert under § 1307(c). The case is DISMISSED.

# # #